Okay, our last case this morning is case number 415-0815, People v. Christian Thomas for the Appellee, John Zimmerman. Mr. Munk, you may proceed. Mr. Munk I'm going to please the Court and Counsel. Your Honors, my name is Carl Munk. I'm with the Office of the State Appellate Defender and I represent Mr. Thomas in this matter. In this case, the parties engaged in pleading negotiations before trial. During those negotiations, the State made three offers to Mr. Thomas. He relied on advice from his attorney and subsequently rejected those offers. It turns out his attorney advised him that he would serve 85% of the sentence in this case, which Mr. Thomas relied on that advice in rejecting those offers. In this case, the parties engaged in pleading negotiations without Mr. Thomas ever being told what would actually happen to him if he accepted these offers. Because he relied on that affirmative misadvice from his attorney and it resulted in prejudice because he ultimately was sentenced to 26 years in prison, which was more than the State's final offer, he was prejudiced by counsel's unreasonable performance. Mr. Munk Well, in reality, actual time served is normally considered a collateral consequence, isn't it? Mr. Zimmerman There is a case law in Illinois saying that the truth in sentencing percentage is a collateral consequence. That is correct. Mr. Munk In your experience, when the State tenders an offer, don't they normally automatically take into consideration the actual time that was given for that proposed offer? Mr. Zimmerman Maybe, possibly. The record here shows the State made an offer of 21 years. It does not explicitly say they conditioned that offer at 85%. Mr. Munk I'm not being critical of you in any way. I'm just asking, do you have trial experience? Mr. Zimmerman I do not have any trial experience. Mr. Munk Okay. So you have not negotiated with the prosecutor  Mr. Zimmerman I have not.  Mr. Zimmerman Now, the fact that in sentencing, both the attorneys and the prosecutor agreed it was 85%, that was probably the discussion between the attorneys. Now, we don't know how exactly it was presented to Mr. Thomas other than he was told that he would serve it at 85%. Whether that was the prosecutor said, here's your offer at 85% or the prosecutor said, here's 21 years and his attorney told him, you will serve that at 85%. Either way, Mr. Thomas rejected these offers based on advice from his attorney that he would serve 85% of that sentence when, in fact, he would only serve 50% of that sentence. And under People v. Correa from the Illinois Supreme Court, the fact that his attorney affirmatively misadvised him as opposed to passively fail to advise him on something means that the direct consequence versus collateral consequence distinction does not matter in this case. That affirmative misadvice overcomes the fact that it was a direct consequence and can still be unreasonable performance by his attorney. I thought the most that Mr. Thomas said was that he might have considered. In his letter, he said, I might have taken that offer. It's not like he sent the letter saying, if I would have known, I would have taken the 21 years. I think the fact that he's sending this letter to the judge at all is indicating at least, I wasn't even presented the real options. I didn't have a chance to actually consider whether I would have because I was never told. And under Lafler, all he has to show is a reasonable probability that he would have accepted the state's offer. And I think a defendant writing a letter to a judge, he might not be willing to be as direct in forthcoming and say, I would have taken this. That's not going to say, your honor, I might have done this differently if I had a chance. I think because all we have is that statement in the letter, at this point, we have to assume there is a reasonable probability that presented with the actual options, the actual sentence he would have served in this case, that he would have taken that offer. Don't you also have to show that there's a reasonable likelihood that the state would have maintained that offer and that the court would have accepted it? Yes, those are also things that have to be shown. On this record, there's no reason to think that the trial judge would not have accepted any plea offer or any plea bargain that the party struck for him. But how about the state? The state thinks he's going to do 85%, right? Yes. And they make an offer for 21 years, right? Yes. Which means actual times of about just under 18 years. That's correct. So if they really wanted him to do 17 years, at 50%, they would have made an offer for 36 years, right? You could speculate that, but we don't know, your honor. Well, again, you're dealing with a prosecutor. Sure. The prosecutor is making an offer, and it's reasonable to believe that the prosecutor is going to take into consideration the actual time served when he makes an offer to a defendant, isn't he? Or she? That's one possible interpretation. Okay. It's also possible that the prosecutors in this case knew they had out-of-state witnesses. They had one witness who was very uncooperative. They had to actually take him into custody and hold contempt over his head to get him to testify. So it's also possible the prosecutors – the final offer was for the statutory minimum. So it was possible the prosecutors were willing to make a deal in this case, even if they didn't get as much time in prison as maybe they wanted, to actually get a conviction here where they knew they had some witnesses who may or may not be as cooperative as they want and things like that. So on this record, we can't say what exactly the prosecutors would have done or would not have done or something like that. And at sentencing, when it was revealed that the truth in sentencing consequences were actually 50 percent, the prosecutor had a chance to make a record to say, whoa, I thought it was 85 percent when we did these plea negotiations. It was 50. I never would have offered 21. That's crazy. But he didn't do that. The plea's already been done. The offer's been made. It's been accepted. And the plea's done. Right? Well, the state didn't have the right to back out of it, did they? Well, there was no plea. Their offers had been rejected. Rejected and went to trial. So what would the state have to say at that point? Well, the prosecutor had a chance to make a record and protect his own thing for exactly this situation. Why does he have to make a record? He just won the trial. Well, because once it's revealed that all the parties misunderstood the sentencing consequences, maybe he could anticipate a claim like this would be coming up and he wanted to make a record. Defense attorneys always have to make a record to protect themselves and protect their clients. It's not unreasonable for a prosecutor to want to do the same thing and explain on the record, here's what I was thinking when I made this offer, all of these things. And he doesn't know yet what the judge's sentence is going to be. Sure. I'm not saying he's required to do this. I'm just saying he had an opportunity to speak up and put on the record what he was doing and why he was doing it for exactly this kind of situation so that if a claim like this comes up later, we know what the And again, at this point, all Mr. Thomas has to show is a reasonable probability that these offers would have gone through. And again, the state started at 35 years, then came down to 25, then came down to 21. That shows the state was willing to deal in this case. The state was working its way down. The state wanted to make something happen. Now, if the parties, when they realized it was 50% instead of 80%, maybe the state would have said, that's too bad, we wish you would get more time, but we still want to make an offer. We still want to get rid of this case, not have to do this trial. The state could be disappointed in the result, but still be willing to go forward. The standard is not that the state happily continues with the offer. The state could say, it's not what I wanted, but we're willing to do it too. I mean, isn't that sort of the best compromise when neither side is really happy with how it comes out? And so, again, Mr. Thomas has to show reasonable probability that he would have accepted it, and the statement in his letter establishes that. Reasonable probability that the offer would not have been withdrawn by the state. Again, the fact that the state was willing to deal and make multiple offers, all the way down to the statutory minimum, shows the state was willing to negotiate and make different deals in this case. And finally, that the court would have accepted the terms. We have no indication on the record, whatsoever, that the judge would not have been willing to accept a reasonable agreement between the parties here. And finally, the actual prejudice was, after trial, he was sentenced to 26 years, when the state's final offer was 21 years, so that difference is the obvious prejudice. And now, under Issue 1, if Your Honors agree with me, the remedy is to send this case back to resume plea negotiations, if those break down, a new trial. Because at this point, it would be, even though the trial itself had nothing to do with these plea negotiations, you can't go back for plea negotiations with the sentence sitting out there, otherwise the state would have no incentive to deal for anything less than what the sentence was after the trial. And as to Issue 2, just in the alternative, if Your Honors believe the record is insufficient to address these claims on direct appeal, that is because the judge failed to make any inquiry under Crankle, when Mr. Thomas wrote this letter bringing this claim to the judge's attention, it was never even addressed on the record. We have the actual letter in the common law record, but the transcripts of the proceedings, nobody ever even brings this up and acknowledges the fact that Mr. Thomas presented these issues to the judge. The letter was a motion for reduction of sentence, right? Yeah, it was a motion for reduction of sentence and motion for appeal. He called it a few different things. He called it a motion for reduction of sentence and then says basically, you know, he didn't know it was 50, everybody thought it was 85. What does he say about his lawyer? He doesn't specifically mention his lawyer, but the context of the letter, the only possible thing he could be saying there was, my lawyer told me the wrong thing when we did these plea negotiations. He's asking for a reduction of sentence. But he also explains that he rejected the plea offers because he thought they were 85%. The only way he thought they would be 85% is if his attorney told him that. And everybody knows that they were all wrong. Yes, exactly. What the judge has in front of him is a prosecutor and defense attorney who both were found to be incorrect at the time of the sentencing hearing. Yes. And now a defendant who's saying, who files a motion to reduce his sentence saying, I was told wrong and I was offered 21 years. That's it. No, that's not all it said. It said, I rejected the plea offers because I was told it would be 85%. Now that I know it's 50%, I might have taken that deal. The obvious implication there is, I got bad advice from my attorney and I rejected offers based on that advice. Any judge or lawyer who reads that, he's a prosecuted defendant making these claims, that obviously has an ineffective sentence of counsel claim in it because the only place that advice would come from is from his attorney. And as you said, everybody already knows that his attorney told him the wrong thing. That's a spread of record. And in People v. Ayers said writing a letter to a judge is a perfectly sufficient way to bring that claim to a judge's attention. And in People v. Lobdell cited my motion to cite additional authority. The third district appellate court said that you don't have to use the magic words, ineffective assistance of counsel, and that's the clear implication of the claim. But in Lobdell, he specifically raised issues about his attorney not bringing up Fourth and Fifth Amendment claims, right? That's correct. Okay, so he made specific reference to his attorney's failure to do something. And in this case, Mr. Thomas did not use his attorney's name or reference his lawyer, but again, when he's complaining that I got bad advice, the only place that could come from is from his attorney. So a judge or lawyer reading that would have to see that he's complaining about what his lawyer told him. He doesn't say he got bad advice. He says at a reduced 50 percent, I might have taken the plea instead of going to trial, which of course is easy to say once you reject the plea, go to trial and get 26 instead of 21. Well, sure, but again, the record shows that his attorney did tell him the wrong thing. We know that already. So it's not that much of a stretch for the judge to read this letter and say, I already know his attorney told him the wrong thing, and now he's saying. Well, in fact, he knows that, and he knows that his lawyer said that in open court in front of the defendant when they were at the sentencing hearing. Exactly. So this has all been done of record already. And that should be enough for the judge to at least ask a couple of follow-up questions. That's the point in People v. Ayers and Jolly. The point of a crinkle inquiry is. Here's what he said, ineffective assistance of counsel. I understand. I'm moving on. The point of a crinkle inquiry is to ask these preliminary questions to see what a defendant's claim might be so that these issues can be hashed out on the record before we get to this stage so that Your Honors actually have a record of what happened. And in this case, you would have taken a few follow-up questions from the judge, and we would know exactly what Mr. Thomas was claiming in his letter. The point is the judge was aware he was complaining about misadvice. No, he was aware that he was asking for a reduction of his sentence. Because he was told incorrectly during the plaintiff's issue, Your Honor. The letter clearly, it's very clear. And he's had the defendant in front of him when they've discussed the fact that it's 85 versus 50 and not 85. Sure. Right. And at that point, the judge was aware that his attorney had given him bad advice. And now the defendant is saying, I got bad advice. That has to be enough for a judge to at least ask a few follow-up questions to ascertain, is there a possible claim of ineffective assistance of counsel? The judge is also aware that that all was raised at the sentencing hearing, and there was no indication at that point in time that the defendant had any issues whatsoever. And it's his motion for reduction of sentence where he says, I might have taken the plea instead of going to trial, but the court is now in front of him. He wrote this letter one or two days after sentencing. And that's, I don't know what else you could expect of a defendant. Was he supposed to wave his hands and start screaming at the sentencing hearing? Wait a minute, this is unfair. No, he gets 30 days to file a motion to reconsider a sentence. He did that. He raised this issue in that letter that he called a motion to reconsider a sentence. Under People v. Ayers and other case law, his letter was sufficient for the judge to conduct a preliminary inquiry under Crank. If your honors have no other questions. Okay, counsel, thank you. You will have rebuttal. Mr. Zimmerman. May it please the court, counsel. Good morning, your honors. My name is John Zimmerman. I'm from the 4th District Appellate Prosecutor's Office. As a somewhat newer attorney, I have to admit that the sentencing statutes and good time credit has been somewhat confusing. But what I do know from interning at the State's Attorney's Office here in Sangamon County is that when you relay an offer to a defendant, instead of really saying you're going to serve 21 years, 85%, you're going to give them the total number of years, which your honor was getting at with that statement. And I think that is what the State's intent was when offering this plea to the defendant. It was 18 years at 85%. If it was going to be 50%, he would have offered 36 years. As your honors are aware, in regards to the objective reasonableness standard under Strickland, in this case, that would be considered a collateral issue, the good time credit. Although in Padilla, as defense counsel noted in his reply brief, that it did say that it didn't really adhere to the strict direct collateral consequence doctrine, if you want to say, as we have in Illinois. It didn't explicitly reject it either. And the State used Padilla as being a somewhat narrow holding that dealt specifically just with deportation. And then in Hughes, our Illinois Supreme Court discussed Padilla, and they held that although commitment as a sexually violent person is considered collateral and has traditionally been held as collateral, they held that that was still a consequence that the prosecutor would need to disclose to the defendant. And now, if you look at the deportation and commitment as a sexually violent person, those are qualitatively different than good time credit. Those are independent harms that accrue in addition to the sentence that the trial court imposed, whereas good conduct credit affects only how much of the sentence imposed the defendant actually serves. It's not something that's settled at the time of sentencing, such as deportation or sexually dangerous person. It gets settled later on through another agency, which is, I believe, the prison, some agency there. And then it can change and fluctuate based on whether they are having good conduct while in prison. So the State's position is that it's still a collateral consequence, and that simply because counsel was incorrect when informing defendant that it was 85 percent instead of 50, that it's not objectively unreasonable. In regards to prejudice, the defendant has failed to prove any of these three prongs that have been set forth in Missouri v. Pry. Reasonable probability that he would have accepted the earlier plea offer had they been afforded effective assistance of counsel. As Your Honor noted, he said he may have accepted it if he knew 21 years was at 50 percent. But that was never the offer. The offer was 21 years at 85 percent. If the State would have realized this, which is the second prong, it would have increased the offer from not 21 years to 85 percent. Is it your argument the defendant has to prove that the State would have changed their offer? It needs to demonstrate a reasonable probability the plea would have changed. How would a defendant ever do that? Show a reasonable probability the State would not have changed their offer if they had known that it required an 85 percent versus 50 percent or vice versa. I'm asking how would a defendant ever meet that standard and show that the State would not have changed its offer? Well, what would a defendant ever do? Call an assistant State's attorney and the State's attorney and ask them? No, I understand what you're saying, Your Honor. But that is the standard that's set forth by the Supreme Court of the United States in Missouri v. Pry. So we're bound to adhere to that standard. And that's also just part of the test, which is that he would have accepted the earlier plea and then that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. So I understand your sentiment, and I do not have an answer that directly answers that question. Well, counsel, neither do I. So I thought I would just ask you. So in regards to the prejudice, the defendant failed to demonstrate any of these reasonable probabilities. As I stated, he said in his letter that he may have accepted it if it was at 50 percent. It was never at 50 percent, so he fails that prong by itself. So he cannot demonstrate prejudice there. And like I said, the intent of the State was 18 years. And the defendant was aware it was 18 years because 21 and 85 percent. And so it was never at 50 percent, regardless of what he says, and the State was not going to keep it at 50 percent. That's just, it defies common sense in my mind. His allegations are speculative. He presumes facts that have not been established. If you look at the Powers case, I think that has a really good analysis of this issue. That's paragraph 8. There's no meaning of the minds on that offer, and in that case, that is essentially the same. It was 85, 50 percent was correct. However, there was a meeting of minds regarding the State's intention in extending the offer. The defendant would serve at least, here, 18 years in prison. The State could achieve such an outcome with the proper rate of good conduct credit by offering the defendant a term of 36 years. There's simply no showing of a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. In the absence of the showing of such prejudice, there's no substantial showing of a constitutional violation, but that was for post-conviction. Counsel, I prefer Powers' language in paragraph 7. The defendant's premise is that had his attorney been confident in raising the correct good conduct credit calculation, the State would have stood by the offer of 14 years with the more generous credit applying. His premise is both speculative and counterintuitive. Not only is there nothing in the record to support this premise, common sense leads one to conclude that the State would have amended its offer upward when it learned of the proper good conduct credit calculation. Yes, I think that's a great statement to rely upon as well, Your Honor. I believe I cited that line of reasoning in my brief. And again, counsel made a comment about the prosecutor making a record simply because the prosecutor doesn't make a record, does not meet an effective assistance of counsel. And the remedy, if you sent it back, I can honestly tell you that the State would offer the 18 years, so 36 years at 50 percent. I know that's speculative and that's what counsel's going to say, but from my experience working at the prosecutor's office, that's what's going to happen. And we all know what's going to occur if there's another trial. It's going to be found guilty. And so we might as well just save judicial resources and affirm the case here. In regards to the Krenkel hearing, the State relies on its brief and echoes the sentiment of Your Honor. There's no clear claim of ineffective assistance of counsel. He did not even mention counsel. And as it's noted in his own letter, it's a motion for appeal, motion for reduction in sentencing, and so there's no reason for the Krenkel inquiry to be had. And as Your Honor stated, it was already all before the Court as to what potential implication there was that occurred. And there was no ineffective assistance in this case, and the State requests this Court to affirm the lower court's judgment. And if there's no further questions, the State rests. Okay. Mr. Zimmerman, I see no further questions. Mr. Mundt, do you have any rebuttal? I have a brief rebuttal. In regards to the question Your Honor asked him about how a defendant could ever prove that the State would not rescind their offer, that's a very good question. That's why it's a reasonable probability, because if the State could defeat a Lackler claim by just always saying, oh, we would have taken the offer back once we knew, a defendant could never win a Lackler claim, because the State could just, in retrospect, say, no, we wouldn't have gone with that offer. And so it can't be just the State's own self-serving statement, to borrow language from Curry, that was used against the defendant. There has to be something in the record to indicate why the State would not have taken this offer. And going back to Justice DeArmond's, your quote from Powers, when parties are engaged in plea negotiations, the years in prison is not the only consideration that the parties take into account. That's not the only thing that matters to each side when engaging in plea negotiations. As I discussed before, in this case, the witness… With all due respect, as a former prosecutor, yes, it is. Again, in this case, the State had multiple out-of-state witnesses. They had uncooperative witnesses. It's possible the State wanted to secure a conviction and some prison time, without the possibility that some of their witnesses don't show up or don't cooperate, or something like that. In regards to counsel saying, we all know what will happen if it goes back, I respectfully disagree. Again, these were out-of-state witnesses. These are uncooperative witnesses. Who knows if the prosecutor is able to track them down this many years later, and actually get them to come in and testify, or how they would testify. We simply don't know. If it goes back and a new trial is awarded, the State has to prove its case again, beyond a reasonable doubt. And finally, as to Powers, that case should not be followed. It is wrongly decided for several reasons. First of all, it doesn't ever mention Correa, which acknowledges the distinction between passive, non-advising from counsel, and affirmative misadvice. In Powers, the court construed the claim as counsel failed to tell him the correct percentage, when what that really is, is he affirmatively told him the wrong percentage. So Powers is incorrect. In fact, if it had followed Correa, a different result had to have happened, because that was affirmative misadvice, and so therefore the collateral consequence doesn't matter, and those reliance in Powers are incorrect. And if you think about what Powers says, the State is allowed to rescind an offer, because it incorrectly knew this collateral consequence. But if a defendant incorrectly advises that that collateral consequence is not prejudice, that seems one-sided and unfair that the State has all the power in that situation. And finally, as to the Crankville thing, the name of the motion or letter that he put, as we know, the name is not controlling, it's the content. And again, he was complaining about advice he got from his attorney. Thank you, Your Honor. Okay. Thanks for the arguments. The case is submitted. The court stands in recess until after lunch.